Slip Op. 05-1

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————— :
                                              :
NSK LTD., NSK CORP.,                          :
NSK PRECISION AMERICA, INC., <u>et</u> <u>al.</u>   :
                                              :
                                              :
                                              :
        Plaintiffs,                           :
                                              :        Before:            WALLACH, Judge
        v.                                    :        Consol. Court No.:  03-00437
                                              :
UNITED STATES,                                :
                                              :
        Defendant,                            :        **PUBLIC VERSION**
                                              :
and                                           :
                                              :
TIMKEN U.S. CORP., <u>et</u> <u>al.</u>            :
                                              :
        Defendant-Intervenors.                :
—————————————————————————:


[United States Department of Commerce's Final Results are sustained.]


                                                        Dated: January 3, 2005


<u>Crowell & Moring, LLP</u>, (<u>Matthew Philip Jaffe</u>, <u>Robert A. Lipstein</u>, and <u>Grace W. Lawson</u>) for
Plaintiffs and Defendant-Intervenors NSK Ltd., NSK Corp., NSK Precision America, Inc.

<u>Barnes, Richardson & Colburn</u>, (<u>Donald J. Unger</u>, <u>Kazumune V. Kano</u>, and <u>Carolyn D. Amadon</u>)
for Plaintiffs and Defendant-Intervenors NTN Corp., NTN Bearing Corp. of America, American
NTN Bearing Manufacturing Corp., NTN Driveshaft, Inc., and NTN-BCA Corp.

<u>Stewart and Stewart</u>, (<u>Terence P. Stewart</u>, <u>William A. Fennell</u>, and <u>Lane S. Hurewitz</u>) for
Plaintiff and Defendant-Intervenor Timken U.S. Corp.


1

Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; Paul D. Kovac and Claudia Burke, Attorneys, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; and Peter G. Kirchgraber, Philip Curtin, Elizabeth Doyle, Marisa Goldstein, Peter Kaldes, Barbara Tsai, Attorney Advisors, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant United States.

**OPINION**

**Wallach, Judge:**

**I**
**INTRODUCTION**

In this action, Plaintiffs NSK Ltd., NSK Corp., and NSK Precision America, Inc. (collectively, "NSK"); NTN Corp., NTN Bearing Corp. of America, American NTN Bearing Manufacturing Corp., NTN Driveshaft, Inc., and NTN-BCA Corp. (collectively, "NTN"); and Timken U.S. Corp. ("Timken") challenge the final results of an administrative review issued by the United States Department of Commerce ("Commerce") in Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and Singapore: Final Results of Antidumping Duty Administrative Reviews, Rescission of Administrative Review in Part, and Determination Not to Revoke Order in Part, 68 Fed. Reg. 35,623 (June 16, 2003) ("Final Results"). The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2003). For the following reasons, Commerce's determination is sustained.

**II**
**BACKGROUND**

On May 15, 1989, Commerce published in the Federal Register the final results in the antidumping duty orders on ball bearings ("BBs") and parts thereof from Japan. Antidumping

2

Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof From Japan, 54 Fed. Reg. 20,904 (May 15, 1989) ("Original Investigation"). On June 25, 2002, Commerce published a notice of initiation of the thirteenth administrative review of the subject Japanese BBs, covering a period of review ("POR") of May 1, 2001, through April 30, 2002. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 67 Fed. Reg. 42,753 (June 25, 2002) ("Initiation of the Thirteenth Administrative Review").

On March 10, 2003, Commerce published the preliminary results in this administrative review in Ball Bearings and Parts Thereof From Japan: Preliminary Results of Antidumping Duty Administrative Review, Partial Rescission of Administrative Review, and Notice of Intent To Rescind Administrative Review, 68 Fed. Reg. 11,357 (March 10, 2003) ("Preliminary Results"). Commerce issued the Final Results on June 16, 2003. The scope of this order covers antifriction balls, ball bearings with integral shafts, ball bearings (including radial ball bearings) and parts thereof, and housed or mounted ball bearing units and parts thereof.[1] Final Results, 68

---

[1] Imports of these products are classified under the following Harmonized Tariff Schedules (HTSUS) subheadings:

> 3926.90.45, 4016.93.00, 4016.93.10, 4016.93.50, 6909.19.5010, 8431.20.00, 8431.39.0010, 8482.10.10, 8482.10.50, 8482.80.00, 8482.91.00, 8482.99.05, 8482.99.2580, 8482.99.35, 8482.99.6595, 8483.20.40, 8483.20.80, 8483.50.8040, 8483.50.90, 8483.90.20, 8483.90.30, 8483.90.70, 8708.50.50, 8708.60.50, 8708.60.80, 8708.70.6060, 8708.70.8050, 8708.93.30, 8708.93.5000, 8708.93.6000, 8708.93.75, 8708.99.06, 8708.99.31, 8708.99.4960, 8708.99.50, 8708.99.5800, 8708.99.8080, 8803.10.00, 8803.20.00, 8803.30.00, 8803.90.30, and 8803.90.90.

Final Results, 68 Fed. Reg at 35,623.

Fed. Reg at 35,623. In the Final Results, Commerce found a 2.68% weighted-average margin for NSK Japan and 4.51% for NTN. See id. at 35,625.

### III
### STANDARD OF REVIEW

This court will sustain any determination, finding, or conclusion of Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. 1516a(b)(1)(B) (2004); Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1368 (Fed. Cir. 1999). "[S]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 95 L. Ed. 456 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 217, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619-20, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) (citing Keele Hair & Scalp Specialists Inc. v. FTC, 275 F.2d 18, 21 (5th Cir. 1960)).

In looking at Commerce's statutory interpretation, this court must go through a two-step analysis. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). The court examines, first, whether "Congress has directly spoken to the precise question at issue," in which case courts, "must give effect to the unambiguously expressed intent of Congress." Id. at 842- 43; see Household Credit Servs. v. Pfennig, 541 U.S.

4

232, 124 S. Ct. 1741, 1746-47, 158 L.Ed. 2d 450 (2004). Whenever Congress has "explicitly left a gap for the agency to fill," the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 843-44. "When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain the [agency's] application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'" Udall v. Tallman, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965) (quoting Unemployment Comm'n v. Aragon, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)).

## IV
## ANALYSIS

### A
### Commerce's Practice of Zeroing Is Supported by Substantial Evidence and Is In Accordance with Law

NSK argues that Commerce's decision to assign a zero margin to export price ("EP") or constructed export price ("CEP") sales made above normal value ("NV")[2] is impermissible under U.S. antidumping law. NSK's Motion for Judgment on the Agency Record ("NSK's Motion") at 7. NSK argues that 19 U.S.C. § 1677(34) (2003) "reformulates the first requirement of section 731" that U.S. sales below fair value are dumped while those that are above fair value are not. Id. at 10. NSK further claims that the definition of dumping margin in 19 U.S.C. §

_____

[2] Commerce's zeroing methodology assigns a zero value to export price and constructed export price sales made above normal value, as opposed to factoring in all home market sales, both above and below normal value, in the margin calculation.

1677(35)(A)[3] "reaffirms that dumping only exists when NV exceeds the EP or CEP *of the subject merchandise*, which section 771(25) defines as 'class or kind of merchandise within the scope of an investigation, a review.'" Id. (emphasis in original). NSK thus concludes that the focus of any antidumping proceeding is the *class* of merchandise involved. Id. (emphasis added). In turn, pursuant to 19 U.S.C. § 1673(1) (2003), NSK claims that "Commerce may impose antidumping duties only when the determination is that *a class or kind of foreign merchandise* is being, or is likely to be, sold in the United States at less than fair value." Id. at 8 (emphasis in original).

NSK cites Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n, 266 F.3d 1339, 1345 (Fed. Cir. 2001), in which the Federal Circuit stated that the U.S. International Trade Commission ("ITC") must analyze "'contradictory evidence or evidence from which conflicting inferences could be drawn . . . to ensure that the subject imports are causing the injury in a tangential or minimal way." Id. at 9; Issues and Decision Memorandum at 11. NSK notes that the court in Taiwan Semiconductors said that injury to domestic industry may not be present merely in the face of less than fair value imports. Issues and Decision Memorandum at 11. NSK argues that Commerce's zeroing methodology impairs analysis of "contradictory evidence or evidence from which conflicting inference would be drawn" that would allow for an unbiased margin calculation. Id. at 11. Commerce's methodology, NSK posits, violates the statute because it "trivializes" U.S. sales above fair value as a "single U.S. sale below NV can produce a dumping margin, even though there exist hundreds of sales for which the opposite is true." NSK's Motion at 8-9. NSK suggests that Commerce's methodology may lead to punitive

_____

[3] Pursuant to 19 U.S.C. § 1677(35)(A), "[t]he term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise."

antidumping margins, disallowed by the Federal Circuit.

Defendant argues that Commerce's zeroing practice is in accordance with U.S. antidumping law. Defendant's Response in Opposition to Timken Company's, NSK's, and NTN's Motions for Judgment Upon the Agency Record ("Defendant's Response") at 14-15. Defendant states that this practice has been upheld by this court and the Federal Circuit in a number of cases. In particular, Defendant cites to Timken Co. v. United States, 354 F.3d 1334 (Fed. Cir. 2004), in which the Federal Circuit upheld Commerce's zeroing methodology as reasonable under the statutory scheme. Id. at 15.

Defendant further argues that NSK's position that Commerce's margin-calculation methodology violates 19 U.S.C. § 1673 is without substance. First, Defendant refutes NSK's argument that its zeroing methodology violates 19 U.S.C. § 1673 by arguing that 19 U.S.C. § 1673 applies to investigations whereas 19 U.S.C. § 1675 covers administrative reviews and requires the dumping analysis to be conducted on an entry-by-entry basis. Issues and Decision Memorandum at 15. Second, Defendant argues that NSK's reliance on Taiwan Semiconductors is erroneous since the Federal Circuit in that case addressed statutory injury in an ITC investigation and not Commerce's margin-calculation methodology. Id. Defendant argues that Taiwan Semiconductors does not support NSK's argument that sales at above normal value are "contradictory evidence" in calculating a dumping margin or that Commerce's not giving those sales equal consideration is evidence of bias. Id. Defendant also says that, in Corus Staal BV v. United States, 259 F. Supp. 2d 1253 (CIT 2003) (citing Bowe Passat Reinigungs-Und Waschereitechnik GmbH v. United States, 20 CIT 558 (1996)), the court stated that "Commerce's justification for zeroing, to protect against masked dumping, was valid and offset

7

any bias." Id. at 16.

Timken supports Commerce's use of the zeroing methodology.  Timken argues that NSK's reliance on Taiwan Semiconductors is erroneous because the case concerns an ITC injury investigation and not zeroing methodology. Id. at 13.  Timken states that Timken affirmed Commerce's zeroing methodology as a reasonable interpretation of the statute. Response of Timken US Corporation, Plaintiff and Defendant-Intervenor, to the Rule 56.2 Motions of NSK Ltd., et al. and NTN Corporation, et al. ("Timken's Response") at 19.

Commerce's zeroing methodology has been directly upheld by this court[4] and most recently by the Federal Circuit in Timken:

> [w]e conclude Commerce based its zeroing practice on a reasonable interpretation of the statute. First, while the statutory definitions do not unambiguously preclude the existence of negative dumping margins, they do at a minimum allow for Commerce's construction. . . . Here, because Commerce's zeroing practice is a reasonable interpretation of the statutory language, we do not question it in light of other reasonable possibilities.

354 F.3d at 1342.

NSK argues that Commerce's zeroing methodology contradicts 19 U.S.C. § 1673 because it ignores the requirement that antidumping duties may only be imposed when a class or kind of merchandise is being, or likely to be, sold in the U.S. at less than fair value and it relies on Taiwan Semiconductors to bolster its argument. NSK's Motion at 9.  NSK's reliance on Taiwan Semiconductors is misplaced.  As Defendant and Timken point out, Taiwan Semiconductors

---

[4] See NSK Ltd. v. United States, 28 CIT __, Slip Op. 04-105 at 12 (Aug. 20, 2004); SNR Roulements v. United States, 28 CIT __, Slip Op. 04-100 at 27 (Aug. 10, 2004); PAM, S.p.A. v. United States, 265 F. Supp. 2d 1362, 1370-73 (CIT 2003); Corus Staal BV v. United States 259 F. Supp. 2d 1253, 1260-65 (CIT 2003); Timken Co. v. United States, 240 F. Supp. 2d 1228, 1242-44 (CIT 2002); Bowe Passat, 20 CIT at 570-72; Serampore Indus. Pvt. Ltd. v. United States, 11 CIT 866, 873-74 (1987).

8

involves the ITC and an ITC injury determination. Issues and Decision Memorandum at 13-16.

NSK has taken this so-called requirement of considering "contradictory evidence" out of context, particularly since the language quoted by NSK suggests specific applicability to the ITC:

> To reach an affirmative material injury determination, the "by reason of" statement in the statute requires the *Commission* to find both material injury and record evidence to show that the subject imports caused the injury. In other words, to properly make a material injury determination, the *Commission* must analyze "*contradictory evidence or evidence from which conflicting inferences could be drawn*," *to ensure that the subject imports are causing the injury, not simply contributing to the injury in a tangential or minimal way*.

Taiwan Semiconductors, 266 F.3d at 1345 (internal citations omitted) (emphasis added).

The Federal Circuit in Timken neither references Taiwan Semiconductors in its analysis nor considers the "contradictory evidence" language in its analysis. In fact, language in Timken rejects NSK's argument that Commerce needs to look at the class or kind of merchandise rather than entry-by-entry:

> Commerce's methodology for calculating dumping margins makes practical sense. Commerce calculates dumping duties on an entry-by-entry basis. 19 U.S.C. § 1675(a)(2). Its practice of zeroing negative dumping margins comports with this approach.

354 F.3d at 1342.

Considering the policy underpinning the statute, an entry-by-entry approach to calculating dumping margins may yield more accurate results, since offsetting dumping margins with sales greater than NV would allow foreign companies to practice selective dumping. See Timken, 354 F.3d at 1342-43. Zeroing "legitimately combats the problem of masked dumping, where certain profitable sales serve to 'mask' sales at less than fair value." Id. (citing Serampore Indus., 11 CIT at 874; Bowe Passat, 20 CIT at 572). NSK has not distinguished this case from Timken in a

9

fashion which would justify an alternate result.[5]  Commerce's methodology is a reasonable interpretation of the U.S. statute.


**2**
**Commerce's Zeroing Methodology Is Reasonable Despite the WTO Decisions in <u>EC – Bed Linen</u> and <u>U.S. – Hot-Rolled Steel</u>**


NSK argues that the WTO decisions in <u>European Communities - Antidumping Duties on Imports of Cotton-Type Bed Linen from India</u>, WT/DS/141/R (Oct. 30, 2000) ("<u>EC - Bed Linen</u> Panel Report"), *aff'd*, WT/DS141/AB/R (Mar. 1, 2001) ("<u>EC – Bed Linen</u> Appellate Body Report") (collectively, "<u>EC – Bed Linen</u>") and <u>United States - Anti-Dumping Measures on Certain Hot-Rolled Steel Products from Japan</u>, WT/DS184/AB/R (July 24, 2001) ("<u>U.S. – Hot-Rolled Steel</u>") show that Commerce has interpreted and applied the U.S. statute in a WTO-inconsistent manner. NSK's Motion at 11-13.  In <u>EC - Bed Linen</u>, the WTO Panel found that the EC's zeroing methodology, similar to that used by Commerce, was WTO-inconsistent.[6]  In <u>U.S. – Hot-Rolled Steel</u>, the WTO Appellate Body found that Commerce's methodology with regards to affiliated party transactions lacked even-handedness.  NSK uses <u>U.S. – Hot-Rolled Steel</u> to illustrate that the antidumping law's "fair comparison" requirement is not met when there is bias inherent in the methodology. Issues and Decision Memorandum at 12.

Defendant argues that <u>EC – Bed Linen</u> is "'not sufficiently persuasive to find

---

[5] In fact, NSK fails to cite or explain the effect of <u>Timken</u> on its arguments in any of its filings.

[6] NSK states that it "**rests its case on U.S. antidumping law**.  Our discussion of the WTO Panel decisions serves only to demonstrate that international legal authorities concur that NSK is right and Commerce is wrong." NSK's Motion at 11 n. 27 (emphasis in original).

Commerce's practice unreasonable.'" Defendant's Response at 16 (citing Timken, 354 F.3d at 1344). In addition to the fact that the Federal Circuit in Timken has stated that EC – Bed Linen provides no bases on which to challenge Commerce's zeroing methodology, Defendant points out that WTO decisions are not binding or precedential to this court. Id. Defendant notes that Timken holds Commerce's methodology reasonable even in light of the URAA's "fair comparison" requirement that NSK claims has been violated. Id. (citing Timken, 354 F.3d at 1343).

Timken says that the WTO's decisions in EC – Bed Linen and U.S. – Hot-Rolled Steel do not affect the validity of Commerce's zeroing methodology. Timken states that the Federal Circuit in Timken pointed out that EC – Bed Linen did not involve the U.S. and dealt with an antidumping investigation and not a review; moreover, the Federal Circuit found "Commerce's zeroing practice to be a reasonable interpretation of the statute, even in light of EC – Bed Linen . . . ." Timken's Response at 20 (citing Timken, 354 F.3d at 1345). With regards to U.S. – Hot-Rolled Steel, Timken argues that this "decision is inapposite" as it did not pertain to zeroing, but rather dealt with Commerce's arms length test. Id.

The Federal Circuit said in Timken that Commerce's zeroing practice is a reasonable interpretation of the statute even in light of EC – Bed Linen. 354 F.3d at 1345. The Timken court pointed out that the "decision is not binding on the United States," much less U.S. courts, and found that the decision is not "sufficiently persuasive to find Commerce's [zeroing] practice unreasonable." Id. at 1344. Moreover, the Federal Circuit agreed with this court's reasoning that EC – Bed Linen could be distinguished in its applicability because the case did not involve the U.S. and it dealt with an antidumping investigation as opposed to an antidumping review. Id. In

11

light of Timken, this court finds that Commerce's zeroing methodology is reasonable, as a matter of law.

NSK says that the WTO Appellate Body's decision in U.S. – Hot-Rolled Steel highlights the "fair comparison" requirement under U.S. antidumping law which NSK argues has not been met with Commerce's use of zeroing. The Federal Circuit in Timken found misplaced the similar "fair comparison" argument made in that case with regard to EC – Bed Linen. Timken, 354 F.3d at 1344. Section 1677b(a) states that "fair comparison shall be made between the export price and constructed export price and normal value." 19 U.S.C. § 1677b(a). "In order to achieve a fair comparison with the export price and constructed export price," the statute lays out how to calculate "normal value." Id. at § 1677(b)(a)(1)-(8); see Timken, 354 F.3d at 1344. The Timken court stated that the "fair comparison" requirement is specifically defined in the context of normal-value-calculation and that

> § 1677b(a) does not impose any requirements for calculating normal value beyond those explicitly established in the statute and does not carry over to create additional limitations on the calculation of dumping margins. The SAA supports our conclusion. SAA at 820 ("To achieve such a [fair] comparison, section 773 [ § 1677b] provides for the selection and adjustment of normal value to avoid or adjust for differences between sales which affect price comparability."). This court has also previously recognized that the explicit statutory adjustments help make a "fair, 'apples-to-apples' comparison" between normal value and EP or CEP. Micron Tech., Inc. v. United States, 243 F.3d 1301, 1313 (Fed. Cir. 2001) (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).

Timken, 354 F.3d at 1344.

Furthermore, while U.S. – Hot-Rolled Steel focuses on whether the U.S. law regarding sales between affiliated parties prevented the distortion of normal value, zeroing deals with Commerce's methodology of assigning a zero margin to EP or CEP sales made above NV. The

WTO decision in U.S. – Hot-Rolled Steel sheds no light on Commerce's zeroing practice. As this court has found in the previous section that Commerce's zeroing methodology is supported by substantial evidence and is in accordance with law, the EC – Bed Linen and U.S. – Hot-Rolled Steel decisions at the WTO do not affect the court's findings.

**B**
**Commerce's Application of the 99.5 Percent Arm's Length Test**
**Is In Accordance With Law**

On November 15, 2002, Commerce published notice of its planned change in methodology for a test used in antidumping proceedings to discern whether comparison market sales between affiliated parties were made at arm's length and thus may be considered within the "ordinary course of trade." Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade, 67 Fed. Reg. 69,186 (Nov. 15, 2002) ("Antidumping Proceedings"). Section 1677b(a)(1) implemented the requirement in Article 2.1 of the Agreement on Implementation of Article VI of the General Agreement ("AD Agreement") on Tariffs and Trade 1994 ("GATT") that investigating authorities exclude sales that are not made in the "ordinary course of trade" from the calculation of normal value. Prior to November 2002, Commerce applied what was commonly known as the "99.5 percent test" which stated that

> comparison market sales by an exporter or producer to an affiliated customer are treated as having been made at arm's length, and may be considered to be within the ordinary course of trade, if prices to that affiliated customer are, on average, at least 99.5 percent of the prices charged by that exporter or producer to unaffiliated comparison market customers.

Antidumping Proceedings, 67 Fed. Reg. at 69,186.

In July 2001, the WTO Appellate Body issued its report in U.S. – Hot-Rolled Steel which

13

said the 99.5 percent test was inconsistent with Article 2.1 of the AD Agreement. At the WTO, the U.S. and Japan entered into arbitration proceedings over the appropriate period of time in which the U.S. could implement the Appellate Body's decision; the U.S. was granted until November 23, 2002.

Pursuant to section 129(g)(1)(C) of the Uruguay Round Agreements Act ("URAA"), Commerce solicited public comment on proposed modifications to its methodology to bring it into conformity with U.S.-WTO obligations. See Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade, 67 Fed. Reg. 53,339 (Aug. 15, 2002). After considering the comments and rebuttal comments, Commerce published its change in methodology:

> The new test will provide that, for sales by the exporter or producer to an affiliate to be included in the normal value calculation, those sales prices must fall, on average, within a defined range, or band, around sales prices of the same or comparable merchandise sold by that exporter or producer to all unaffiliated customers. The band applied for this purpose will provide that the overall ratio calculated for an affiliate be between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers in order for sales to that affiliate to be considered "in the ordinary course of trade" and used in the normal value calculation. This new test is consistent with the view, expressed by the WTO Appellate Body, that rules aimed at preventing the distortion of normal value through sales between affiliates should reflect, "even-handedly," that "both high and low-priced sales between affiliates might not be 'in the ordinary course of trade.'"

Antidumping Proceedings, 67 Fed. Reg. at 69,187. This revised methodology, the "98-102 percent test," was to be applied "in all investigations and reviews initiated on or after November 23, 2002." Id. at 69,197.

Commerce initiated the Thirteenth Administrative Review at issue on June 25, 2002. NSK requested Commerce to employ the 98-102 percent test to calculate NSK's NV, but Commerce used the 99.5 percent test. NSK requested that Commerce use the 98-102 percent test

in the final determination, since it provided evidence that Commerce had included sales to certain customer codes with arm's length ratios above 102 percent. NSK's Motion at 5. Commerce rejected NSK's request and NSK has now brought this matter before this court.

**Commerce's Use of the 99.5 Percent Test Was Appropriate in the Present Case**

NSK argues that Commerce's decision to use the 99.5 percent test and failure to instead use the 98-102 percent test violates U.S. law. NSK's Motion at 15. NSK argues that Timken Co. v. United States, 240 F. Supp. 2d 1228 (CIT 2002), *aff'd*, 354 F.3d 1334 (Fed. Cir. 2004), which upheld the 99.5 percent test as a reasonable interpretation of U.S. statute, is not applicable to this case because at issue is Commerce's use of the 99.5 percent test in the Final Results on June 16, 2003, "seven months after it stipulated that this test was unlawful." Id. at 15-17. NSK posits "whereas a statute or an agency regulation will have retroactive effect only if clear intent is present, retroactive application of agency and judicial decisions is the rule rather than the exception." Id. at 17. NSK claims that Commerce has wrongly framed this issue as a change in methodology or practice as opposed to a regulatory or rule change.[7] Plaintiffs' Reply Memorandum in Support of Motion for Judgment on the Agency Record ("NSK's Reply") at 7.

NSK argues that the selective prospectivity used by Commerce breaches the principle that similarly situated parties should be treated the same in similar situations, such as at the time of the case decision and case initiation. NSK's Motion at 17-18. While NSK concedes that these legal principles do not apply to WTO dispute settlement decisions, it claims that:

> they [WTO dispute settlement decisions] certainly apply to a judgment by the

---

[7] During Oral Argument, counsel for NSK, however, stated that Commerce's change from the 99.5 Percent to the 98-102 Percent Test was a "change in methodology."

United States promulgated so as to implement the WTO decision . . . Therefore, when Commerce applied the 99.5 test seven months after the United States declared it unlawful, Commerce violated the legal presumption that this review should be decided based on the law existing at the time of the AFB13 final determination.

Id. at 19.

NSK argues that Commerce's application of the 99.5 percent test in this case works a "manifest injustice" and has lead erroneously to the inclusion of sales in NSK's NV calculation. Id. at 18-19 (referencing Verizon Tel. Cos. v. United States, 269 F.3d 1098, 1109 (D.C. Cir. 2001)). Furthermore, NSK claims, because the WTO Appellate Body found the 99.5 percent test inconsistent with WTO obligations in July 2001, parties were to be on "full notice" that the test was invalid and they could not rely on the test. Id.

Defendant argues that the application of the 99.5 percent test to NSK's sales in the Final Results was in accordance with the law.[8] Defendant states that the Federal Circuit and this court have affirmed the 99.5 percent test on many occasions and that Commerce's implementation of the 98-102 percent test was "entirely prospective in nature." Defendant's Response at 17. Defendant points out that the present case was initiated on June 25, 2002, five months before November 23, 2002, the day on which the 98-102 test went into effect. Although NSK points out that "agency regulation[s] will have retroactive effect only if clear intent is present," Defendant argues that the general rule disfavoring retroactivity applies to administrative regulations. Id. at 21-22 (citing Shakeproof Assembly Components Div. of Ill. Tool Works, Inc. v. United States, 102 F. Supp. 2d 486, 493 (CIT 2000)). Here, Defendant argues, Commerce only intended

_____

[8] During Oral Argument, counsel for Defendant argued that the arm's length change in ownership test is not codified into U.S. law and that it is just an interpretation of the law. Thus, counsel stated that the change is "not a change in the law, it is just a change in the practice."

prospective application of this "new rule" and there is no evidence of a clear intent of retroactive application. Id. at 22.

Defendant posits that NSK brought this challenge to the effective date of the new test in the improper forum: "nothing precluded NSK from challenging this implementation date in court when Commerce first announced the date after a thorough notice-and-comment proceeding."[9] Id. at 19-20. Defendant also states that Timken sustained Commerce's use of the 99.5 percent test even though the court was aware that Commerce was in the process of changing its test. Id. at 20. Defendant states that WTO decisions have no binding effect under U.S. law and the executive branch is to decide whether and in what manner to implement adverse reports. Id. (referencing 19 U.S.C. §§ 3533, 3538; SAA, H.R. Doc. No. 103-316 at 1032). Defendant also argues that there has been no "manifest injustice" here as both the POR and most of the review process occurred before the announcement of the new test. Id. at 23.

Timken argues that the 99.5 percent test is not illegal, that this court and the Federal Circuit have both deemed the test reasonable on numerous occasions, and that Commerce agreed to modify its test because of the WTO Appellate Body ruling "without repudiating or otherwise calling into doubt the validity of its prior methodology." Timken's Response at 21-22. Timken says that retroactivity is not a favored principle in the law which also applies to administrative regulations. Id. at 22-23. Timken points out that Commerce set a specific implementation date

_____

[9] During Oral Argument, counsel for NSK stated that the Commerce's change from the 99.5 Percent Test to the 98-102 Percent Test did not undergo notice and comment procedures. The November 15, 2002, Federal Register, however, states that "[o]n August 15, 2002, [Commerce] solicited comments on [its] proposed modification to practice with respect to treatment of affiliated party sales in the comparison market. We received numerous comments submitted pursuant to this notice, as discussed below." Final Rule, 67 Fed. Reg. at 69,187 (internal citations omitted) (referring to Request of Public Comment Pursuant to section 129(g)(1)(C) of the Uruguay Round Agreements Act, 67 Fed. Reg. 53,339 (Aug. 15, 2002)).

for its new test, which made its temporal application clear.  Furthermore, Timken draws the distinction that the presumption in retroactivity more strongly applies in cases of changes in the law as opposed to revisions; in this case, argues Timken, Commerce's revised arm's length is "analogous to a change in law."[10] Id. at 24.

Commerce's prospective application of the 98-102 percent test and use of the 99.5 percent test prior to November 23, 2002, is in accordance with law.  The Supreme Court has stated that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988); Landgraf v. USI Film Prods., 511 U.S. 244, 264, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994).

Here, Commerce specifically stated in the Federal Register notice instituting the change from the 99.5 percent test to the 98-102 percent test that the new test was to be applied "in all investigations and reviews *initiated* on or after November 23, 2002." Antidumping Proceedings, 67 Fed. Reg. at 69,197 (emphasis added).  The 99.5 percent test itself, as Defendant states, was not codified but is instead explained in the preamble to the regulation, 19 C.F.R. § 351.403, and went through notice and comment procedures.[11] See Defendant's Response at 17 (citing

---

[10]  During Oral Argument, however, counsel for Timken stated that the change in test is a "methodological change."

[11]  Additionally, as Defendant and Timken note, the 99.5 percent test was never deemed illegal by a U.S. court and was found to be a reasonable interpretation of the statute. NSK Ltd. v. Koyo Seiko Co., 190 F.3d 1321, 1327-28 (Fed. Cir. 1999).  In fact, this court upheld the use of the 99.5 percent test as reasonable after it had been deemed WTO-inconsistent by the Appellate Body in U.S. – Hot Rolled Steel and after Commerce had published in the Federal Register its request for comments on the proposed change in its arm's length policy on August 15, 2002. Timken v. United States, 240 F. Supp. 2d 1228, 1240 n. 17 (CIT 2002).  The court, however,

18

Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27,296, 27,355 (May 10, 1997)).  Similarly, the 98-102 percent test was a change in the mathematical application of the regulation's methodology which went through notice and comment procedures.[12]  Commerce thus provided adequate notice to parties involved in antidumping proceedings that there would be a prospective change in its arm's length methodology from a definitive point forward.  Despite its arguments to the contrary,[13] NSK had no reasonable expectation at the Initiation of the Thirteenth Administrative Review that any other methodology other than the 99.5 percent arm's length would be used to calculate normal value.  The notice and comment period for the change in the

does not believe that the validity of the 99.5 percent test is relevant to the discussion.  It only addresses the issue in passing because Plaintiff NSK alleged that Commerce was enforcing an "illegal" test when this was not the case.

[12] Counsel for NSK during oral argument claimed that a prospective start date of a new methodology based upon the *initiation* date of an administrative proceeding departs from Commerce's usual practice.  Counsel cited as an example Policy Bulletin 94.4 (March 25, 1994) which states that the change implemented by the Bulletin "should be used in all investigations and reviews for which a preliminary determination has not been reached by the issue date of this bulletin, and in all final determinations in which the issue has been raised in comments from interested parties."  Changes in methodology through Policy Bulletins differ from those done through formal notice and comment proceedings published in the Federal Register.  Because Commerce went through the necessary procedures required under U.S. law to change its methodology based on an adverse WTO adjudicatory decision, the effective date on which the new methodology would take effect in an administrative proceeding was within Commerce's discretion.

[13]  NSK argues that all parties to antidumping proceedings were on notice after the July 2001 WTO Appellate Body's decision in U.S. – Hot-Rolled Steel that the 99.5 percent test methodology was invalid and that they could not rely on the application of the test.  While WTO adjudicatory decisions may be persuasive, they are not binding on Commerce or this court. See Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-826, at 822 (1994) at 1032; Timken, 354 F.3d at 1344; Hyundai Elec. Co. v. United States, 23 CIT 302, 311 (1999).  Where the specific procedures, pursuant to 19 U.S.C. § § 3533 and 3538, have not been followed, and U.S. law changed, a finding by a WTO Panel or the Appellate Body has no applicability in U.S. law and creates no binding legal precedent in U.S. courts.  During Oral Argument, counsel for NSK could not provide to the court any authority to support NSK's position.

test was only published in the August 15, 2002, Federal Register, two months after the review had begun.

NSK also has provided insufficient evidence that Commerce has applied this prospective change in a selective manner. The Supreme Court has held that in the context of a federal court applying a new judicial rule that selective prospectivity is prohibited. James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 537, 111 S. Ct. 2439, 115 L. Ed. 2d 481 (1991). A similar prohibition should be applied to administrative agency changes in methodology for there is the same underlying policy reason why selective prospectivity is undesirable: similarly situated litigants might receive disparate treatment which undermines the rule of law. See id. While NSK has cited a number of reviews to support its argument of selective prospectivity, it has seemingly confused the *initiation* of a review with the *period of review* in these cases: all the reviews it has cited were *initiated after* November 23, 2002.[14]

There is no evidence that Commerce has treated similarly situated parties in a disparate manner. Commerce "unlike a court, does have the ability to make new law prospectively through the exercise of its rule-making powers," see SEC v. Chenery Corp., 332 U.S. 194, 202, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947), and it has applied this change in its arm's length methodology in a

_____

[14] In NSK's Reply at 9 n.7, it cites: Initiation of Antidumping and Countervailing Duty Administrative Reviews, 67 Fed. Reg. 78,772 (Dec. 26, 2002); Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 68 Fed. Reg. 3009 (Jan. 22, 2003); Initiation of Antidumping and Countervailing Duty Administrative Reviews, 68 Fed. Reg. 9048 (Feb. 27, 2003); Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part, 68 Fed. Reg. 14,394 (Mar. 25, 2003); Initiation of Antidumping and Countervailing Duty Administrative Reviews, 68 Fed. Reg. 19,498 (Apr. 21, 2003); Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 68 Fed. Reg. 27,771 (May 21, 2003). During Oral Argument, counsel for NSK stated that he recognized that these cited Federal Register notices were for initiations of countervailing duty administrative reviews and indicated that he had cited them in error.

purely prospective manner. Commerce's use of the 99.5 percent test in this case is in accordance with law.

**C**

**Commerce's Determination To Recalculate NTN's Indirect Selling Expenses Is In Accordance with Law**

NTN reported its indirect selling expenses based on the ratio of the selling expenses to U.S. sales value in its questionnaire response. Rule 56.2 Motion and Memorandum for Judgment on the Agency Record Submitted on Behalf of Plaintiffs NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. And NTN-BCA Corporation ("NTN's Motion") at 3. The ratio resulting from NTN's submitted data was [Ratio A]. Timken in its case brief submitted to Commerce during the administrative review informed Commerce that NTN's reported ratio was incorrect. Commerce then recalculated NTN's ratio as it was unable to replicate NTN's results and arrived at a higher ratio of [Ratio B].

NTN argues that Commerce incorrectly made adverse adjustments to its U.S. indirect selling expenses without providing NTN an opportunity to comment. Id. at 2. NTN argues that Commerce should have used NTN's reported data or reconciled the differences in the ratios prior to making an adverse facts available judgment. Id. NTN argues that Timken has provided no direct evidence to challenge NTN's data and that it adequately responded to Timken's allegations. Id. at 5; Plaintiffs and Defendant-Intervenors, NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-BCA Corporation Response to the Timken U.S. Corporation's Rule 56.2 Motion for Judgment on the Agency Record ("NTN's Response") at 3, 4. NTN argues that, pursuant to

21

19 U.S.C. §§ 1677m(d) & 1677e, it should have been allowed to explain the apparent deficiencies in its data. NTN's Motion at 6 (citing NTN Bearing Corp. v. United States, 104 F. Supp. 2d 110, 142 (CIT 2000)).

Defendant argues that Commerce's determination to recalculate NTN's indirect selling expense ratio was in accordance with the law. Defendant's Response at 23. Defendant states that Commerce neither ignored relevant facts nor applied facts available. Id. at 24. Defendant says that NTN's reported its indirect selling expense ratio at [Ratio A], but that Commerce was not able to duplicate NTN's numbers. Id. at 25. Thus, after NTN explained that the expenses it had listed in its filings were not only indirect selling expenses but also were expenses taken into account in other parts of its responses, Commerce recalculated the indirect selling expense ratio utilizing the information NTN provided for the review and did not rely on the use of facts available. Id. at 25-27. Commerce applied a [Ratio B] indirect selling expense ratio for the Final Results. Id. at 25-26. Defendant argues that NTN's argument that it did not have the opportunity to address apparent inconsistencies fails because Commerce did not apply facts available and thus never determined that a deficiency existed. Id. at 28.

Timken argues that Commerce correctly calculated NTN's indirect selling expense ratio and that, because Commerce could not arrive at the same numbers that NTN did in calculating its ratio, it could not determine whether NTN's data was distortive and thus recalculated the ratio. Timken's Response at 14. Timken supports Commerce in arguing that Commerce did not impose facts available to NTN's indirect selling expenses and thus did not have to meet the notification requirement of 19 U.S.C. § 1677m. Id. at 8. Timken further claims that Commerce failed to determine accurate U.S. prices for and to attribute a correct amount of selling expenses

22

to NTN's sales. Timken U.S. Corporation's Memorandum in Support of its Rule 56.2 Motion for Judgment on the Agency Record ("Timken's Motion") at 22.

Commerce was well within its discretion to test the accuracy of NTN's indirect selling expense ratio as reported. After being unable to duplicate NTN's submitted calculations through its inquiry, Commerce found that NTN had double-counted its indirect selling expenses, i.e. that those expenses had been captured elsewhere. Defendant's Response at 27-28. Commerce then adjusted the indirect selling expense ratio calculation to prevent the duplicative accounting of these expenses: it did not disallow the expenses altogether. Id. Rather, it says it based its determination on a different analysis of the actual facts as supplied by NTN. By its nature, a "facts available" analysis necessarily implies that Commerce used facts where the actual facts are an insufficient basis for a complete analysis. See 19 U.S.C. § 1677e(a); NTN Bearing Corp. v. United States, 368 F.3d 1369 (Fed. Cir. 2004). Commerce recalculated "the indirect selling expense ratio using NTN's record information provided for in this review"; it did not apply a facts available analysis pursuant to 19 U.S.C. §1677e, as argued by NTN.[15] Id. at 25. NTN has not established that Commerce's methodology is either unlawful or unsupported by substantial evidence, and accordingly, it must be sustained. See generally NTN Bearing Corp., 368 F.3d at 1369.

---

[15] NTN argues that Commerce had applied facts available because Commerce used NTN's reported cost data for different purposes than that for which it had been submitted. Counsel for NTN argued during oral argument that, while Commerce thus had not explicitly used facts available in this case, Commerce had used an "effective/*de facto*" facts available analysis. For the existence of such a *de facto* facts available analysis, counsel cited Kaiyuan Group Corp. v. United States, Slip Op. 04-51, 2004 Ct. Int'l Trade LEXIS 75 (May 14, 2004). Kaiyuan concerned a nonmarket economy antidumping administrative review and the court found that Commerce's collapsing methodology was not in accordance with law. Kaiyuan did not add a new concept of effective/*de facto* facts available to the law.

**D**
**Commerce's Acceptance of NTN's Allocation Methodology for the Calculation of Indirect Selling Expenses Is in Accordance with Law**

NTN argues that Commerce correctly accepted its allocation methodology (other than for those certain expenses Commerce moved) because

> rather than *allocating* certain [affiliate expenses relating to non-subject merchandise, these expenses were removed before the allocation of expenses] that are not clearly related to either subject or non-subject merchandise took place. This methodology simply does not distort the margin calculations.

NTN's Response at 11-12. Defendant also argues that Commerce's decision to accept NTN's allocation methodology as far as NTN's removal of expenses attributable to non-subject merchandise was proper. Defendant's Response at 29.

Timken claims that Commerce erroneously accepted NTN's allocation methodology. Timken argues that Commerce incorrectly double-allocated [certain expenses to non-subject merchandise] sales and thus accepted a distortive allocation. Timken's Motion at 21-22.

Commerce was within its discretion to accept NTN's allocation methodology as reported. Pursuant to 19 C.F.R. § 351.401(g)(1) (2003)[16], Commerce is permitted to consider allocated

---

[16] Under 19 C.F.R. § 351.401(g) Allocation of expenses and price adjustments,

> (1) In general. The Secretary may consider allocated expenses and price adjustments when transaction-specific reporting is not feasible, provided the Secretary is satisfied that the allocation method used does not cause inaccuracies or distortions.

> (2) Reporting allocated expenses and price adjustments. Any party seeking to report an expense or a price adjustment on an allocated basis must demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions.

> (3) Feasibility. In determining the feasibility of transaction-specific reporting or

expenses when the "method does not cause inaccuracies or distortions." The party reporting the

allocation expenses must explain to Commerce, under 19 C.F.R. § 351.401(g)(2), "why the

allocation methodology does not cause inaccuracies or distortions." Section 351.401(g)(4) also

provides that Commerce cannot "reject an allocation method solely because the method includes

expenses incurred, or price adjustments made, with respect to sales of merchandise that does not

constitute subject merchandise or a foreign like product (whichever is applicable)." Defendant

argues that nothing in U.S. law further explains how the allocation of selling expenses must be

undertaken and thus the court should accept Commerce's methodology if it is reasonable.

Defendant's Response at 30 (citing Koenig & Bauer-Albert AG v. United States, 15 F. Supp. 2d

834, 844 (CIT 1998)).

Both 19 U.S.C. § 1677a(d), the relevant statute, and the regulation, 19 C.F.R. §

351.401(g), give little direction on allocation methodology, and thus Commerce enjoys discretion

in choosing its methodology. See Timken Co. v. United States, 209 F. Supp. 2d 1373, 1381 (CIT

2002); NSK Ltd. v. United States, 245 F. Supp. 2d 1335, 1378-79 (CIT 2003). In both Timken

and NSK, this court upheld an allocation methodology regarding expenses connected with non-

scope merchandise similar to that used by Commerce in this case. There is no reason to depart

---

whether an allocation is calculated on as specific a basis as is feasible, the Secretary will take into account the records maintained by the party in question in the ordinary course of its business, as well as such factors as the normal accounting practices in the country and industry in question and the number of sales made by the party during the period of investigation or review.

(4) Expenses and price adjustments relating to merchandise not subject to the proceeding. The Secretary will not reject an allocation method solely because the method includes expenses incurred, or price adjustments made, with respect to sales of merchandise that does not constitute subject merchandise or a foreign like product (whichever is applicable).

from previous decisions finding Commerce's methodology reasonable.

Defendant has also provided sufficient evidence to support its findings. Defendant states that Commerce was "satisfied that NTN properly removed only indirect selling expenses from its allocation pool attributable to non-subject merchandise." Defendant's Response at 29. Commerce further found that NTN, in its questionnaire and final responses, had

> [removed the total amount of expenses that were unrelated to subject merchandise and calculated the indirect selling expense ratio based on the remaining total figures.]

Id. at 30 (internal citations omitted). Based on NTN's questionnaire and supplemental responses, Commerce determined that NTN's "[allocation methodology] was not distortive." Id. Given the standard of review, the court may not reweigh the evidence or substitute its own judgment for that of Commerce. See Granges Metallverken AB v. United States, 13 CIT 471, 474 (1989). Commerce's decision to accept NTN's allocation methodology is thus supported by substantial evidence and is in accordance with law.

**E**
**Commerce's Decision to Accept NTN's Reported Costs and Not Apply Facts Available Is Supported by Substantial Evidence and Is In Accordance With Law**

Timken argues that Commerce improperly relied on NTN's reported cost data and wrongly concluded that the data captured NTN's actual experience. Timken's Motion at 15. Timken argues that the information NTN provided regarding its standard cost variance was insufficient. Id. at 18-19. Cost decreases in relatively small amounts, Timken states, can be explained by the variances reported, but not changes of the magnitude that NTN reported. Id. at 19.

Defendant argues that Commerce's determination to accept NTN's reported cost data was

proper. Defendant's Response at 32-33. Commerce found that NTN had adequately explained the "[cost variances]." Id. at 34. Because NTN answered fully all of Commerce's requests for information, Defendant states that Commerce's decision to not apply facts available pursuant to 19 U.S.C. § 1677e(a)[17] is supported by substantial evidence. Id. at 33, 37-38.

NTN argues that Commerce correctly accepted its reported costs. NTN states that Commerce did not question the accuracy of is cost of production or constructed value data and was satisfied that NTN had fully responded to Commerce's request for information. NTN's Response at 3. NTN claims that it provided and Commerce accepted its explanation for the variance in its costs from the previous years. NTN also argues that Commerce rightly did not use facts available in this case as NTN provided complete and accurate responses to requests and

---

[17] Pursuant to 19 U.S.C. § 1677e Determinations on the basis of the facts available,

(a) In general. If –

(1) necessary information is not available on the record, or

(2) an interested party or any other person–

(A) withholds information that has been requested by the administering authority or the Commission under this title,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677n of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677n(i)of this title, the administering authority and the Commission shall, subject to section 1677n(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

Commerce was satisfied with its submissions. Id. at 9-10.

Commerce acted within its discretion in accepting NTN's reported cost data. Commerce considered the record with the questionnaire responses, supplemental questionnaire responses, administrative briefs and rebuttal briefs in reaching its conclusion. Defendant's Response at 37. With regards to its change in costs, Commerce found that NTN in its Section D questionnaire response set out its general cost accounting methodology and explained how the changes in its plants and processes could affect its reported costs. Id. at 34. Commerce found that NTN's providing of a "meticulous spreadsheet" to address Timken's allegation of radically changing costs from the previous reviews was convincing. Id. at 35-36. Furthermore, in its supplemental questionnaire which concerned how NTN's cost variances affected reported costs, Commerce determined that NTN provided sufficient explanation of its variance calculation methodology for specific products. Id. at 34-35. Commerce also found that

> [i]n addition to its questionnaire responses, NTN's November 6, 2002, submission explained to Commerce why [cost variances]. For example, NTN pointed to a [change in production costs]. Specifically, NTN provided Commerce with an exhibit that explained that the [cost changes were based on a demonstrated change in procedures]. In addition, NTN detailed how [the global change affected specific parts].

Id. at 35 (internal citations omitted). Because Commerce determined that NTN had submitted the requested information in a timely, useable manner, it correctly found that it did not need to utilize facts available pursuant to the statute to calculate NTN's antidumping margin. Commerce's decision to accept NTN's reported cost data and not apply facts available is supported by substantial evidence and is in accordance with law.

28

**V**
**CONCLUSION**

For the foregoing reasons Commerce's Review in <u>Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and Singapore: Final Results of Antidumping Duty Administrative Reviews, Rescission of Administrative Review in Part, and Determination Not to Revoke Order in Part</u>, 68 Fed. Reg. 35,623 (June 16, 2003) is sustained.

/s/    <u>Evan J. Wallach, Judge</u>

Dated: January 3, 2005
      New York, New York